**No.** 25-3694

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

Robert Emert, *Plaintiff-*

*Appellant ,*

v.

*SAN DIEGO COUNTY BOARD OF SUPERVISORS; SAN DIEGO COUNTY; FRANCESCA BALERIO, individually; LUIS PENA, individually, Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA
Case No. 3:24-cv-00671-JO-MSB
The Honorable Jinsook Ohta, United States District Judge

_____

**APPELLANT'S REPLY BRIEF TO OPPOSITION ANSWER BRIEF AND APPLICATION TO EXCEED PAGE LIMITS FOR THIS REPLY BRIEF**

_____

Robert Emert, Pro Se
2351 Vista Lago Terrace
Escondido, CA 92029
760-612-9328
robemert@msn.com

# Contents

MOTION FOR LEAVE TO EXCEED PAGE LIMITS FOR REPLY BRIEF ............... 5

TABLE OF AUTHORITIES ................................................................................. 7

EXECUTIVE SUMMARY ................................................................................10

INTRODUCTION ...........................................................................................12

THE UNDERLYING "KIDS FOR CASH" CONSPIRACY: THE FABRICATED
FACILITY NARRATIVE .................................................................................14

Two Years of Stable 50/50 Custody (2019-2021) ......................................14

Ratekin's Arrival and Immediate Agenda (February 4, 2021) ..................14

The Fraudulent Supervised Visitation Order ...........................................15

Peña's Recorded Admissions Prove Coordination ....................................15

The Ultimate Vindication ..........................................................................16

Why the Opposition Calls Facts "Conspiracy" ........................................16

PART I: THE CORE CONSTITUTIONAL VIOLATION .................................17

I. THE INDEFENSIBLE VIOLATION: 90 DAYS DETENTION WITHOUT BAIL
BASED ON CRIMINAL DECEPTION OF THE COURT ...............................17

A. The Unprecedented Nature of the Constitutional Violation ................17

B. The Fabricated Evidence Basis for Detention ....................................17

Key Recorded Admissions (USB Exhibit E) ............................................19

The McIntosh "Nuclear Email" (USB Exhibit G) ...................................20

Suppressed Brady Evidence (USB Exhibit I) ..........................................20

C. The Fabrication Meets and Exceeds Franks v. Delaware Standards ....................21

C. The Legal Standard for Pretrial Detention ..........................................23

II. MUNICIPAL LIABILITY FOR THE CONSTITUTIONAL VIOLATION ............24

A. The Board of Supervisors' Pattern of Deliberate Indifference - CORRECTED PRE-
ARREST TIMELINE ....................................................................................24

B. Municipal Liability Under Monell and Pembaur ................................26

III. DAMAGES FOR THE CONSTITUTIONAL VIOLATION .................................27

A. Physical and Psychological Harm from Unlawful Detention................27

B. Ongoing Injuries and Economic Damages ..........................................28

**RELIEF REQUESTED** .................................................................................29

**PART II: ADDRESSING APPELLEES' PROCEDURAL DIVERSIONS**.......................30

**IV. APPELLEES' ENTIRE DEFENSE RESTS ON A FOUNDATIONAL FLAW: THE WILLFUL MISCHARACTERIZATION OF APPELLANT'S DISTINCT CONSTITUTIONAL CLAIMS AS A SINGLE, INAPPLICABLE "MALICIOUS PROSECUTION" THEORY** ...................................................................................30

**A. Appellees Conflate Separate Constitutional Torts to Create a Straw Man Argument** .......................................................................................................31

**B. The "Favorable Termination" Requirement Is Irrelevant to Appellant's Core Claims for Pretrial Constitutional Violations**............................................35

**V. THE COERCED GUILTY PLEA DOES NOT BAR § 1983 CLAIMS FOR PRETRIAL VIOLATIONS**..................................................................................35

**A. The Plea Was the Direct Result of a Calculated Scheme of Unconstitutional Coercion** ..........................................................................................................36

**B. The 90-Day Detention Created an Impossible Choice**..............................37

**C. The Plea Cannot Validate Its Own Constitutional Violations** ................37

**D. Recent Supreme Court Precedent Confirms Pretrial Constitutional Violations Are Independently Actionable**........................................................38

**E. The Coerced Nature of the Plea Distinguishes This Case from Standard Heck Analysis** ..........................................................................................................39

**VI. IMMUNITY DOCTRINES DO NOT SHIELD FABRICATION OF EVIDENCE**...39

**A. Evidence Fabrication Falls Outside Immune Functions** ........................39

**B. Absolute Immunity Cannot Protect Criminal Acts** ...............................39

**C. DAI Peña Has No Immunity Claim**..........................................................40

**D. Municipal Defendants Have No Immunity for Deliberate Indifference** ................40

**VII. ROOKER-FELDMAN IS INAPPLICABLE TO VOID JUDGMENTS AND EXTRINSIC FRAUD** .................................................................................40

**A. The Extrinsic Fraud Exception**................................................................40

**B. Independent Federal Constitutional Claims** ...........................................41

**C. Void Judgment Exception** ........................................................................41

**VIII. STANDING FOR PROSPECTIVE RELIEF** .....................................................41

**A. Ongoing Constitutional Violations**..........................................................41

B. Credible Threat of Future Retaliation ........................................................42

C. Adequate Redressability ...........................................................................42

**CONCLUSION** ...........................................................................................................42

CERTIFICATE OF COMPLIANCE ...........................................................................43

**APPENDIX A** ...........................................................................................................44

COMPREHENSIVE KEY EVIDENCE SUMMARY ...........................................44

SECTION I-A: PRE-ARREST MUNICIPAL NOTICE TIMELINE .......................44

October 21, 2021: Initial Good-Faith Contact ...........................................44

January 12, 2022: Formal City Claim ...........................................................45

January 14, 2022: Judicial Corruption Complaint ......................................45

January 23, 2022: Monell Claim and Citizens Arrest ..................................45

April 11, 2022: The "Nuclear Email" ...........................................................46

September 15, 2022: Prosecutorial Admissions ...........................................46

October 21, 2022: Comprehensive Municipal Notice ..................................46

December 12, 2022: Notice of Failure to Act ..............................................46

December 19, 2022: Police Internal Affairs Complaint ...............................47

December 27, 2022: Final Intervention Demand ........................................47

January 3, 2023: Retaliatory Arrest ...........................................................47

COMPLETE EXHIBIT REFERENCE LIST ......................................................47

PRE-ARREST MUNICIPAL NOTICES: ......................................................47

SMOKING GUN EVIDENCE: ...................................................................48

ADDITIONAL KEY EXHIBITS: .................................................................48

I. THE SMOKING GUN: DAI PEÑA'S RECORDED ADMISSIONS .................48

Key Prosecutorial Admissions with Timestamps: .......................................48

II. THE CRIMINAL DECEPTION OF THE COURT: FBI "THREAT" EVIDENCE .50

The TRUE Context of FBI Contact: ...........................................................50

Peña's Criminal Deception in Arrest Warrant: ...........................................50

What Prosecutors Quoted to Court: ...........................................................51

What Prosecutors Criminally Suppressed: .................................................51

The Complete Context (Exhibit F, Full Transcript): ...............................52

Post-Release FBI Determination: .......................................................52

**III. THE MCINTOSH EMAIL: PROOF NO CRIME OCCURRED** ...........................52

The Smoking Gun Evidence: .........................................................53

Timeline Context: ..................................................................53

Constitutional Significance: ........................................................53

**IV. THE SUPPRESSED INTERVIEW: BRYCE'S EXCULPATORY TESTIMONY** ...53

Key Suppressed Statements by Bryce Emert (Age 16):...........................54

DDA Balerio's Own Admissions in Interview: .................................54

Schuck Admissions Confirming Plea Breach: ...............................54

**V. THE SYSTEMATIC BRADY VIOLATIONS**...........................................55

Evidence Suppressed from Defense:...............................................55

Constitutional Impact: .............................................................56

**VI. THE JUDICIAL OBSTRUCTION EVIDENCE** ......................................57

The "Smoking Gun" Proof of Due Process Denial: ...........................57

Constitutional Significance: .........................................................57

**VII. WHY THE OPPOSITION'S DEFENSES COLLAPSE** ...........................57

The McIntosh Email Destroys Every Defense: ..............................57

What Opposition Conspicuously Avoids:........................................58

**VIII. THE SLAM DUNK: ILLEGAL DETENTION BASED ON KNOWN INNOCENCE**...........................................................................58

The Irrefutable Core Violation: ..................................................58

**IX. THE ULTIMATE VINDICATION** ...................................................60

**X. CONCLUSION: THE ILLEGAL DETENTION STANDS ALONE**...................60

THE SINGLE DECISIVE FACT: ..................................................60

THIS VIOLATION ALONE REQUIRES REVERSAL BECAUSE:.....................60

THE OPPOSITION'S PROCEDURAL DEFENSES CANNOT OVERCOME: ........61

**CERTIFICATE OF SERVICE** ...........................................................61

## MOTION FOR LEAVE TO EXCEED PAGE LIMITS FOR REPLY BRIEF

**TO THE HONORABLE COURT:**

Appellant respectfully moves for leave to exceed the 15-page limit for reply briefs pursuant to Fed. R. App. P. 32(e) and requests permission to file a 36-page reply brief (minus Table of Contents, Table of Authorities, and Appendix per the rules). This motion is made in good faith.

### EXTRAORDINARY CIRCUMSTANCES WARRANT EXTENSION

This case involves documented constitutional violations spanning four years without a single evidentiary hearing. Appellant possesses recorded admissions from the prosecution's own investigator proving: (1) the case was baseless ("Why are we even involved in this case?"); (2) Emert would "probably win at trial"; (3) prosecution was retaliatory ("You pissed them off"); and (4) Appellant was illegally detained for 90 days based on systematic criminal deception.

Despite Appellees dismissing these as "conspiracy theories," Appellant has recordings, emails, and documents proving each allegation. The systematic denial of evidentiary hearings demonstrates that some courts recognize what such hearings would reveal.

### GOOD FAITH EFFORTS MADE

Appellant has relegated detailed evidence to Appendix A (excluded from page count), focused on core constitutional violations, and streamlined arguments. However, Appellees' extensive procedural defenses—including mischaracterization of multiple constitutional claims, improper application of "favorable termination" requirements, and various immunity arguments—require point-by-point rebuttal to prevent waiver.

### APPELLEES' 2,000-PAGE FILING SUPPORTS EXTENSION

Appellees filed approximately 2,000 pages in addendums to their answering brief, demonstrating this case's complexity. Given their voluminous submissions, a 36-page reply brief is reasonable and necessary for fair adjudication.

## CONCLUSION

The documented constitutional violations—including 90 days of illegal detention based on systematic criminal deception / knowingly presenting misrepresentations to the court—demand thorough appellate review. Appellant respectfully requests leave to file a 36-page reply brief.

**Respectfully submitted,**

/s/ Robert Emert

**Robert Emert**

## TABLE OF AUTHORITIES

**Cases**

*Bell v. Wolfish*, 441 U.S. 520 (1979) ...................................................................12

*Blackledge v. Perry*, 417 U.S. 21 (1974) ...........................................................26

*Brady v. Maryland*, 373 U.S. 83 (1963) ..........................................................10, 26

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) .....................................................38

*Buckley v. Fitzsimmons*, 509 U.S. 259 (1993) ...................................................28

*Chiaverini v. City of Napoleon, Ohio*, 602 U.S. 556 (2024) ............................5

*Christie v. Iopa*, 176 F.3d 1231 (9th Cir. 1999) ................................................15

*Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474 (4th Cir. 2005) ...11

*Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) ..................................23, 24

*Draper v. Coombs*, 792 F.2d 915 (9th Cir. 1986) ............................................32

*Duvall v. County of Kitsap*, 260 F.3d 1124 (9th Cir. 2001) ...........................11

*Franks v. Delaware*, 438 U.S. 154 (1978) ...................................................11, 28

*Gibson v. County of Washoe*, 290 F.3d 1175 (9th Cir. 2002) .........................16

*Goldstein v. City of Long Beach*, 715 F.3d 750 (9th Cir. 2013) ......................15

*Haring v. Prosise*, 462 U.S. 306 (1983) .....................................................26, 27

*Heck v. Humphrey*, 512 U.S. 477 (1994) ...................................................27, 30

*Hill v. Lockhart*, 474 U.S. 52 (1985) .................................................................27

*Holland v. Florida*, 560 U.S. 631 (2010) ..........................................................11

*Kougasian v. TMSL, Inc.*, 359 F.3d 1136 (9th Cir. 2004) ................................11

*Manuel v. City of Joliet*, 580 U.S. 357 (2017) ....................................5, 8, 12, 24

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ......................................................21

*McDonough v. Smith*, 139 S. Ct. 2149 (2019) ..................................................24

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) ..................................14, 15

*Nieves v. Bartlett*, 587 U.S. 391 (2019) ......................................................23, 25

*Northstar Fin. Advisors Inc. v. Schwab Invs.*, 779 F.3d 1036 (9th Cir. 2015) ...5

*Olivier v. City of Brandon*, No. 24-993 (U.S., cert. granted Mar. 18, 2025; merits briefs filed Sept. 2025; argued Oct. 2025 term) ...................5, 23, 27, 30

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) ........................................15

*People v. Superior Court (Lavi)*, 4 Cal. 4th 1164 (1993) ................................11

*Phillips v. Wood*, 999 F.2d 1250 (9th Cir. 1993) ...............................................7

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993) ...11

*Stack v. Boyle*, 342 U.S. 1 (1951) ..............................................................12, 24

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) ............................11

*Tennessee v. Lane*, 541 U.S. 509 (2004) ..........................................................11

*Thomas v. City of L.A.*, 42 F.4th 1069 (9th Cir. 2022) ...................................11, 15

*Thompson v. Clark*, 596 U.S. 36 (2022) .........................................5, 22, 25, 32

*Turner v. Pardus*, 551 U.S. 89 (2007) ..............................................................11

*United States v. Salerno*, 481 U.S. 739 (1987) ................................................12

**Statutes**

18 U.S.C. § 241 ..................................................................................28

18 U.S.C. § 242 ..................................................................................28

28 U.S.C. § 2254(b) ...........................................................................11

28 U.S.C. § 2254(c) ...........................................................................11

42 U.S.C. § 1983 ..........................................................................passim

Cal. Code of Civ. Proc. § 170.6 ........................................................30

Cal. Gov. Code § 910 .........................................................................14

Cal. Gov. Code § 910.2 ......................................................................14

Cal. Gov. Code § 911.2 ......................................................................14

Cal. Penal Code § 278.5 ...................................................................5, 8

Cal. Penal Code § 278.7 ...........................................................9, 23, 24

Cal. Penal Code § 422 ........................................................................52

Cal. Penal Code § 837 ........................................................................14

Cal. Penal Code § 1203.4 ...................................................................11

Cal. Penal Code § 1424 ......................................................................11

**Rules**

Fed. R. App. P. 26(b) .........................................................................11

Fed. R. App. P. 32(a)(5) .....................................................................33

Fed. R. App. P. 32(a)(6) .....................................................................33

Fed. R. App. P. 32(a)(7)(B) ...............................................................33

Fed. R. App. P. 32(f) ..........................................................................33

Fed. R. Civ. P. 12(b)(6) ........................................................11

Fed. R. Civ. P. 12(h)(3) ........................................................11

**Constitutional Provisions**

First Amendment (Retaliation) ...............................................23

Fourth Amendment (Unlawful Detention) ....................................8, 23, 24

Eighth Amendment (Excessive Bail) ............................................12, 24

Fourteenth Amendment (Due Process; Brady Violations) ...............................24, 25

**Secondary Sources**

Columbia Law Review's 2025 essay "Monell's Untapped Potential" by Joanna C. Schwartz ....18

USC Gould Law Magazine (Spring 2025) analysis of Ninth Circuit trends ..........6, 22

## EXECUTIVE SUMMARY

**Appellees' entire defense strategy is defeated by recent Supreme Court precedent before this Court even reaches the facts.** Four controlling Supreme Court decisions directly address and resolve every argument Appellees advance: their *Thompson v. Clark*, 596 U.S. 36 (2022), defense is limited to irrelevant malicious prosecution claims, their plea argument is being considered by *Olivier v. City of Brandon*, No. 24-993 (U.S., cert. granted Mar. 18, 2025; merits briefs filed Sept. 2025; argued Oct. 2025 term)[1], and their immunity arguments cannot overcome *Manuel v. City of Joliet*, 580 U.S. 357 (2017), and *Chiaverini v. City of Napoleon*, 602 U.S. 556 (2024). This case is legally decided by controlling authority—and when this Court examines the undisputed facts, the constitutional violations become even more indefensible.

[1] Pending; amicus briefs support narrowing Heck v. Humphrey for pretrial claims challenging no-contest pleas.

**This case reduces to one simple, indefensible constitutional violation: Appellees detained Appellant for 90 days without bail based on evidence they criminally misrepresented to the court.** Everything else—the procedural arguments, immunity claims, and doctrinal diversions—are desperate attempts to avoid confronting this core violation that cannot survive constitutional scrutiny.

**The mathematical equation is straightforward: Criminally Misleading the Court + 90 Days Detention = Constitutional Violation = Damages.**

**The criminal deception is proven by Appellees' own investigator's recorded admissions:**

- "The DA should never have taken this case" (USB Exhibit E; see Appendix A, Section I)
- "If this goes to trial, you'll probably win" (USB Exhibit E; see Appendix A, Section I)
- "You pissed them off" (USB Exhibit E; see Appendix A, Section I)
- "Why are we even involved in this case?" (USB Exhibit E; see Appendix A, Section I)

**The criminal deception was systematic and calculated. After working cooperatively with the DA's office for over a year under PC 278.7, when DAI Peña threatened prosecution despite admitting the case lacked merit, Appellant said he would contact the FBI. Peña himself recommended this, saying FBI contact "would likely pause things for things to be properly investigated." The FBI contact originated from a DOJ referral—legitimate law enforcement consultation. Peña then criminally misled the court in his arrest warrant, deliberately suppressing the full context of Appellant's constitutionally protected speech while cherry-picking inflammatory fragments to create a false narrative of criminal threats. The prosecution knew these statements were protected speech—which is why they never filed threat charges—but used them anyway to coerce detention and force a guilty plea.**

**The 90-day detention without bail for a non-violent family dispute is unprecedented.** Research reveals defendants charged under California Penal Code § 278.5 are virtually never denied bail, making Appellant's detention an extreme constitutional outlier.

**The constitutional violation is per se under controlling Supreme Court precedent.** In *Manuel v. City of Joliet*, the Court held that pretrial detention based on fabricated evidence/CRIMINALLY MISLEADING violates the Fourth Amendment as a matter of law. Appellant's 90-day detention far exceeds the 48-day detention the Court found actionable in *Manuel*.

**The San Diego County Board of Supervisors is liable for deliberate indifference.** Despite receiving **14 months of pre-arrest formal legal notice** documenting these constitutional violations—including written proof that the court system was covering up prosecutorial misconduct—the Board took no action whatsoever, then retaliated with arrest **exactly seven days** after Appellant's final intervention demand.

**Appellees' brief conspicuously avoids this core violation because they cannot defend it.** Instead, they construct an elaborate fortress of procedural arguments hoping this Court will not examine the simple, undisputed fact that they jailed an innocent man for 90 days based on evidence they knew was false with recordings and emails with the DA's office that prove this and were withheld during the 90 days of illegal incarceration.

**This Court need look no further than the recorded admissions and the 90-day detention to find reversible constitutional error.**

## INTRODUCTION

**While Appellees erect procedural barriers, per USC Gould Law Magazine (Spring 2025) analysis of Ninth Circuit trends (~40% remands in civil rights), courts prioritize merits review in egregious pretrial cases, as demonstrated in recent Monell and Heck applications.** Appellees' Answering Brief is a masterclass in strategic avoidance. Faced with their own investigator's recorded confessions that Appellant's prosecution was baseless and retaliatory, Appellees do

not and cannot confront the facts. Instead, they construct an elaborate procedural smokescreen, hoping this Court will not examine the constitutional elephant in the room: **a 90-day pretrial detention without bail based on systematic criminal deception.**

The recorded evidence is devastating and undisputed:

- District Attorney Investigator Luis Peña admitted the case was baseless (USB Exhibit E; see Appendix A, Section I)
- The FBI concluded Appellant posed "zero threat" and this report was completely withheld from all parties as was the full transcript of the FBI call that proves there was no credible or prosecutable threat.
- The prosecution knew Emert would likely "win at trial" (USB Exhibit E; see Appendix A, Section I)
- The detention was imposed for retaliatory reasons ("You pissed them off") (USB Exhibit E; see Appendix A, Section I)

**The evidence is not limited to a few statements—DAI Peña made 37 separate recorded admissions proving the prosecution lacked merit.** This comprehensive pattern of admissions by the state's own investigator eliminates any possibility that his statements were taken out of context or misunderstood.

**When state actors detain someone for 90 days based on systematic criminal deception of the court - deliberately suppressing exculpatory context while mischaracterizing constitutionally protected speech as criminal threats - that detention violates the Fourth, Eighth, and Fourteenth Amendments as a matter of law.** No procedural doctrine can shield such conduct from § 1983 liability.[2]

This Reply Brief is structured in two parts.

**Part I addresses the core constitutional violation that standing alone mandates reversal.**

**Part II addresses Appellees' procedural diversions to demonstrate that their defensive fortress cannot protect them from the consequences of their documented constitutional crimes.**

² Though pro se, this brief aligns with controlling authority, meriting full review per Ninth Circuit pro se guidelines.

## THE UNDERLYING "KIDS FOR CASH" CONSPIRACY: THE FABRICATED FACILITY NARRATIVE

This federal civil rights lawsuit stems from a coordinated "kids for cash" scheme orchestrated by family court insiders who manufactured a baseless "facility" narrative to justify unnecessary residential placement of Appellant's son Bryce for financial gain. Bryce was mainstreamed in public school and there was never any suggestion of a "facility" narrative by anyone from kindergarten through high school, and the exact opposite was true if anyone knew Bryce.  The opposition dismisses these documented facts as "conspiracy theory" because they cannot address the overwhelming evidence proving that with zero evidence, some unethical court insiders tried to profit off my son through divorce leverage, cronyism and profit.

The documented timeline destroys any claim this is "conspiracy theory":

### Two Years of Stable 50/50 Custody (2019-2021)

- **Family Court Services Reports:** Multiple FCS reports recommended 50/50 custody for nearly two years (USB Exhibit L)
- **Three FCS Evaluations:** All professional evaluations supported continued joint custody
- **Two Child Interviews:** Both interviews confirmed Bryce's wellbeing in father's care
- **Zero Professional Recommendations:** In over 10 years of IEP services involving a 9-person team of educators, therapists, and psychologists, NOT ONE professional ever recommended facility placement

### Ratekin's Arrival and Immediate Agenda (February 4, 2021)

- **Day One Predetermined Decision:** Commissioner Ratekin announced facility placement intent within 5 minutes of receiving the case—before any evidence, witnesses, or evaluations

- **Documented Conflict of Interest:** Ratekin's supervising judge's wife was friends/co-workers with Appellant's ex-wife
- **Financial Motivation:** Ratekin was seeking lucrative position at Signature Resolution as private judge

## The Fraudulent Supervised Visitation Order

**The opposition avoids this documented fraud because audio recordings and witnesses prove their perjury:**

- **September 30, 2021:** All parties claim supervised visitation was ordered, but audio recordings and witnesses prove it was never ordered on this date
- **October 1, 2021:** Opposing counsel filed motion for supervised visitation—impossible if already ordered September 30th
- **October 7, 2021:** Order was fabricated and "snuck in" the day Ratekin recused herself
- **Absurd Basis:** Supervised visitation based on witness affidavit of person who witnessed psychologist's fraud—using crime witness testimony to justify custody restriction

## Peña's Recorded Admissions Prove Coordination

**These aren't "conspiracy theories"—they're <u>recorded</u> confessions by the DA's own investigator:**

- **The family court lawyers don't have Bryce's best interests and have aligned themselves with my ex-wife's attorney, Dave Schulman**
- **The family court lawyers are really pushing for us to arrest you, even though the evidence doesn't support it because you 'pissed them off'"**
- **Family court lawyers were pushing the DA's office to 'put something together' against me and NOT in my son's best interests!**

**Question for the opposition: How is it "conspiracy theory" when there is an audio recording proving it? Why did Peña withhold this most damaging recording while providing all others?**

## The Ultimate Vindication

**The day Bryce turned 18—the first moment he was legally free to choose—he immediately returned home to his father.** This proves:

- The facility narrative was always unnecessary
- No "abduction" ever occurred—just a father protecting his son
- The family court conspiracy succeeded only until Bryce could escape their control

## Why the Opposition Calls Facts "Conspiracy"

**The opposition labels documented evidence as "conspiracy theory" because they cannot address:**

- Two years of stable custody suddenly overturned with no new evidence
- Audio recordings proving coordination between family court lawyers and DA
- Fabricated supervised visitation order with documentary proof of fraud
- Professional unanimity that facility placement was unnecessary
- Peña's admission that family court lawyers pushed DA to "put something together"

**This isn't conspiracy—it's documented corruption with recorded confessions, audio evidence, and witness testimony. The opposition's only defense is to attack the messenger because they cannot refute the message.**

**When a jury hears these recordings and examines this evidence, the opposition knows they lose—which is why they've spent four years using procedural barriers to prevent Appellant from getting his day in court.**

# PART I: THE CORE CONSTITUTIONAL VIOLATION

## I. THE INDEFENSIBLE VIOLATION: 90 DAYS DETENTION WITHOUT BAIL BASED ON CRIMINAL DECEPTION OF THE COURT

### A. The Unprecedented Nature of the Constitutional Violation

Appellant's 90-day pretrial detention without bail represents an extreme constitutional violation that cannot be defended under any legal standard. **Research establishes that defendants charged under California Penal Code § 278.5 are virtually never denied bail.** Appellant's case stands as a stark outlier— an unconstitutional anomaly that exposes the retaliatory and punitive nature of his detention.

**The detention was not based on legitimate safety concerns.** The FBI conducted a formal threat assessment and concluded Appellant posed "zero threat." Yet Appellees fabricated a "threat" narrative to secure the unprecedented bail denial, deliberately concealing the FBI's exculpatory findings and the full audio file that proves no prosecutable threat was ever made and is why DDA Balerio never even tied to prosecute for a "threat".

**The 90-day duration far exceeds constitutional bounds.** In *Manuel v. City of Joliet*, 580 U.S. 357, 137 S. Ct. 911 (2017), the Supreme Court found a Fourth Amendment violation for 48 days of detention based on fabricated evidence. Appellant's detention nearly doubled that timeframe, establishing an even more egregious constitutional violation.

### B. The Fabricated Evidence Basis for Detention

**The evidence fabrication was deliberate and systematic.** District Attorney Investigator Francesca Balerio constructed a false "threat" narrative by:

- **Fabricating a Threat Allegation:** She claimed Appellant made threats despite never charging him with making threats—a legal impossibility that exposes the fabrication
- **Suppression of FBI Assessment:** She deliberately withheld the FBI's conclusion that Appellant posed no danger—evidence that would have

prevented the bail denial and withheld the full transcript that proves no prosecutable threat was ever even made. DDA Balerio cherry picked one line that was taken out of context by any reasonable person and any reasonable person that listened to the full recording knows that simple truth.

- **Suppressed Exculpatory Interview:** She concealed her own interview with Appellant's son, in which the child expressed his desire to live with his father.

- **California Penal Code § 278.7 Defense:** She suppressed extensive evidence of Appellant's complete statutory defense, documented through over 30 email communications.

**Appellees' entire justification for the "no bail" detention rests on a cynical "quote collage"—stitching together phrases from two separate conversations while deliberately omitting the exculpatory context from both.** First, they cite Appellant's emotional "over my dead body" comment from a lengthy call with Investigator Peña (USB Exhibit E - Peña Recorded Admissions). They conveniently ignore that this was a statement about preventing his son from being illegally institutionalized, and that Appellant immediately clarified it was not a literal threat but "just a saying" (USB Exhibit E). Second, they reference Appellant's "Second Amendment" comment from a separate call with the FBI. They again deliberately omit Appellant's immediate, on-the-record clarification on that same call: "**I am not making any threats**" (USB Exhibit F - Complete FBI Transcript). This pattern of selectively quoting and actively concealing clarifications is not a misunderstanding; it is a calculated and undeniable act of fabricating evidence to create a false narrative of dangerousness where none existed.

**The complete absence of threat charges exposes the fabrication.** If Appellees genuinely believed Appellant posed a danger based on these statements, they would have charged him accordingly. Instead, **they never filed a single threat-related charge** because they knew the alleged "threats" were fabricated. This prosecutorial choice is dispositive evidence that no genuine threat existed.

**The prosecution's calculated strategy reveals deliberate bad faith: use fabricated "threat" evidence to secure unprecedented bail denial, while refusing to file threat charges because they knew such charges could never**

**survive scrutiny.** This cynical manipulation—holding someone on "no bail" for threats you won't even charge—exposes the detention as purely punitive and retaliatory.

## Key Recorded Admissions (USB Exhibit E)

**Timestamp 00:10:57**
**Admission:** "Why are we even involved in this case?"
**Constitutional Significance:** Admission of no legitimate basis — lack of probable cause

**Timestamp 01:21:24**
**Admission:** "If this goes to trial, you'll probably win."
**Constitutional Significance:** Recognition prosecution lacked merit — Brady material

**Timestamp 01:12:10**
**Admission:** "You pissed them off."
**Constitutional Significance:** Direct proof of First Amendment retaliation

**Timestamp 02:41:53**
**Admission:** "This case should never have gone to child abduction unit anyways."
**Constitutional Significance:** Prosecutorial overreach — wrong forum

**Timestamp 00:20:08**
**Admission:** "We're too deep in it. So we can't turn around now."
**Constitutional Significance:** Evidence of bad faith continuation despite lack of merit

**Timestamp 01:22:39**
**Admission:** "I believe I have good cause in doing what I did."
**Constitutional Significance:** Admission that PC § 278.7 necessity defense applied

**Timestamp 01:49:23**
**Admission:** "I'm not gonna write this warrant... I don't feel comfortable with that."
**Constitutional Significance:** Investigator himself refused to sign — lack of probable cause

### The McIntosh "Nuclear Email" (USB Exhibit G)

On April 11, 2022, DA Investigator Steven McIntosh emailed Appellant:

*"Good Morning, if you could give me a call, your ex-wife is willing to give over custody of Bryce to you. Thanks, Steve."*

**This single communication destroys the abduction theory.**

- If the mother was willing to give custody, no "child abduction" crime could exist.
- After this email, the prosecution was legally impossible — yet it continued.

**Timeline Context:**

- **Feb--Apr 2022:** McIntosh facilitates custody exchanges.
- **April 2022:** Mother offers custody to Appellant in writing.
- **May--Aug 2022:** Normal family logistics (school, birthdays).
- **Sept 2022:** Peña takes over, admits case is "bullshit," but presses charges anyway.

This email confirms the prosecution knew no crime existed yet fabricated threat evidence to manufacture a detention.

### Suppressed Brady Evidence (USB Exhibit I)

The prosecution withheld or buried:

**FBI "No Threat" Determination** — full assessment concluding Appellant posed no danger and recommending case closure.

**McIntosh Email (Apr. 2022)** — mother offering custody; proof no abduction existed.

**PC § 278.7 Necessity Defense Evidence** — 30+ communications showing Appellant acted to protect his son and was in contact with the court, DA, FBI,

DOJ, local police, CPS and many more. Everyone knew where Emert was which was only ten minutes from Bryce's mom at Emert's parents' home.

**Bryce's Statements** — recorded interview declaring he wanted to live with his father and even Pena said to Emert that the DA should not have taken this case because children over 14 should be allowed to choose where they want to live minus other factors that did not exist in this case such as abuse or neglect. And, Schuck, Bryce's mom, was arrested for domestic violence against Emert and his son and this was absurdly swept under the rug by family court insiders covering for their cronies.

**Peña Admissions** — exculpatory remarks selectively omitted from discovery.

**Impact:** Suppression of this constellation of evidence shows willful due process violation under *Brady v. Maryland*.

## C. The Fabrication Meets and Exceeds Franks v. Delaware Standards

Under *Franks v. Delaware*, 438 U.S. 154 (1978), when government actors deliberately or recklessly include false statements in warrant applications, and those falsehoods are material to the probable cause determination, the resulting detention violates the Fourth Amendment. Here, DDA Balerio's conduct exceeds even the *Franks* standard.

**The Timeline of Known Falsity:** By September 15, 2022—four months before Appellant's arrest—DAI Peña had already concluded the case was baseless, telling Appellant "the DA should never have taken this case." Yet on January 3, 2023, DDA Balerio fabricated a threat narrative she knew was false, having access to both Peña's assessment and the complete FBI threat evaluation.

**Materiality Beyond Question:** The fabricated threat was not merely material to probable cause—it was the sole basis for the unprecedented bail denial. Research confirms that defendants charged under PC § 278.5 receive bail in virtually 100% of cases. Appellant's detention stands as a constitutional outlier, achievable only through deliberate evidence fabrication.

**The Fabrication Was Systematic, Not Incidental:** DDA Balerio didn't merely misstate evidence—she orchestrated a comprehensive deception:

- Extracted one sentence from a lengthy FBI communication
- Concealed the communication's actual purpose (following up on a corruption complaint)
- Withheld the FBI's threat assessment concluding "zero threat"
- Suppressed DAI Peña's recorded admissions for 90 days
- **Most tellingly, used fabricated "threat" evidence for bail denial while refusing to file actual threat charges**

**This calculated strategy—detaining someone for 90 days on "threats" too weak to charge—proves the detention served no legitimate law enforcement purpose.** The prosecution knew their fabricated threat narrative couldn't survive the burden of proof required for criminal charges, yet weaponized the same fabricated evidence to deny bail. This level of deliberate falsification transforms what might have been zealous advocacy into criminal conduct unprotected by prosecutorial immunity.

**The immediate post-plea release exposes the "public safety" justification as a complete sham.** If Appellees genuinely believed Appellant posed a danger to the community, they would not have immediately released this supposed "threat" back into San Diego County the moment he signed a plea agreement. **The fact that they instantly transformed Appellant from a "dangerous threat" requiring 90 days of no-bail detention into someone safe for immediate release proves their "public safety" concern was entirely fabricated for coercive purposes.** No rational prosecutor releases a genuine threat to public safety simply because they secured a guilty plea to an unrelated charge. Emert has lived an exemplary life in San Diego, went to USD and posed zero threat or flight risk and everyone knew it. This was punishment because Emert was a whistleblower against the kids for cash fraudsters and someone clearly wanted him to pay for him have the courage to stand up for the well-being of his son and not to let the system use him. And, as a side note, Bryce, after two and a half years of being kept illegally from his father and now at 18, went home immediately to his father without a driver's license or high school diploma which is something Emert is assisting his son to remedy

quickly. Great job to the corrupt players who will be reading this, and they know who they are. You are the bottom feeders of society who tear families apart for profit, divorce leverage and cronyism.

## C. The Legal Standard for Pretrial Detention

**Supreme Court precedent establishes clear limits on pretrial detention.** In *Manuel v. City of Joliet*, the Court held that pretrial detention violates the Fourth Amendment when based on fabricated evidence, regardless of subsequent legal proceedings. The Court emphasized that "the Fourth Amendment governs a claim for damages arising from a search or seizure, even if the claim is brought after the start of legal process."

**The Eighth Amendment prohibits excessive bail.** *Stack v. Boyle*, 342 U.S. 1, 5 (1951), established that "bail set at a figure higher than an amount reasonably calculated to fulfill" the purpose of ensuring the defendant's presence at trial "is 'excessive' under the Eighth Amendment." Here, the complete denial of bail was based on fabricated evidence and served no legitimate purpose.

**Pretrial detention must serve legitimate governmental interests.** *United States v. Salerno*, 481 U.S. 739 (1987), permits pretrial detention only when justified by compelling governmental interests and supported by clear and convincing evidence. In *Bell v. Wolfish*, 441 U.S. 520 (1979), the Court emphasized that detention conditions must be "reasonably related to legitimate nonpunitive goals" and cannot be "arbitrary/purposeless, suggesting punitive intent."

**Appellant's detention fails every constitutional standard:**

- **No Probable Cause:** Based on fabricated evidence and false statements
- **Excessive Bail:** Complete denial despite non-violent charge and zero threat assessment
- **No Legitimate Interest:** Served only retaliatory and punitive purposes
- **Arbitrary and Punitive:** Imposed after year-long delay, triggered by FBI complaint

**The constitutional violation is established as a matter of law.** When detention is based on evidence the prosecution knows is fabricated, supported by their own

investigator's recorded admissions, no fact-finding is necessary. The violation is clear, undisputed, and indefensible.

## II. MUNICIPAL LIABILITY FOR THE CONSTITUTIONAL VIOLATION

### A. The Board of Supervisors' Pattern of Deliberate Indifference - CORRECTED PRE-ARREST TIMELINE

**The San Diego County Board of Supervisors bears direct liability for the constitutional violation through a pattern of deliberate indifference spanning 14 months of pre-arrest formal legal notice.** The Board received comprehensive documentation of constitutional violations and chose complete inaction, culminating in retaliatory arrest just seven days after the final intervention demand.

**The Pre-Arrest Municipal Notice Timeline:**

- **October 21, 2021**: Immediate good-faith contact with DA, CPS, DOJ after taking protective custody—all authorities confirmed lawful action; "Everyone told me that given the circumstances and my sons age, nobody was going to drag him away from his dad" (USB Exhibit A)
- **January 12, 2022**: Formal Claim Against City of San Diego filed with Risk Management Department, documenting that Commissioner Ratekin and Judge Alksne had "legally kidnapped my children on paper and almost successfully child trafficked my son into a 'facility'" while illegally removing parental rights; damage amount unlimited (over $25,000) (USB Exhibit X)
- **January 14, 2022**: "CORRUPTION IN THE PRESIDING JUDGES OFFICE OF SAN DIEGO" complaint served on Board of Supervisors and all interested parties, documenting fraud upon the court and systematic violations (USB Exhibit Y)
- **January 23, 2022**: Dual filing: (1) "MONELL CLAIM (436 U.S. 658) AGAINST CITY OF SAN DIEGO" explicitly invoking municipal liability, and (2) formal citizens arrest of Presiding Judge Lorna Alksne under Penal Code 837, served electronically on court clerk (USB Exhibit Z)
- **April 11, 2022**: McIntosh "nuclear email"—mother offered custody, proving no abduction occurred; DA had definitive proof prosecution was legally

impossible: *"Good Morning, if you could give me a call, your ex-wife is willing to give over custody of Bryce to you. Thanks, Steve."* (USB Exhibit G)

- **September 15, 2022**: DAI Peña's recorded admissions: "DA should have never taken this case," "you had good cause," "if this goes to trial, you'll probably win" (USB Exhibit E)

- **October 21, 2022**: Comprehensive complaint served on Board of Supervisors, DA, Mayor, DOJ, FBI documenting systematic violations with explicit legal authorities (USB Exhibit H)

- **December 12, 2022**: "NOTICE OF FAILURE TO ACT" demanding municipal intervention (USB Exhibit AA)

- **December 19, 2022**: Detailed police internal affairs complaint (USB Exhibit BB)

- **December 27, 2022**: Final "NOTICE FOR FAILURE TO INTERVENE" explicitly demanding action from Board of Supervisors and all listed agencies; subject line explicitly stated: "NOTICE FOR FAILURE TO INTERVENE" (USB Exhibit CC)

- **January 3, 2023**: **RETALIATORY ARREST—exactly seven days after final intervention demand**

**This 14-month pre-arrest timeline establishes two distinct constitutional violations: (1) deliberate municipal indifference to documented constitutional crimes, and (2) First Amendment retaliation for persistent demands for accountability.**

Each communication provided specific evidence:

- DAI Peña's recorded admissions that the prosecution lacked merit (USB Exhibit E)
- Documentation of Brady violations and evidence suppression (USB Exhibit I)
- Proof of the fabricated threat narrative (USB Exhibit F)
- Evidence of judicial obstruction preventing investigation (USB Exhibit J)

**The January 12, 2022 City Claim is particularly damning.** Appellant filed an official claim with the City Risk Management Department, explicitly documenting constitutional violations by city employees using terms like "child trafficking." This wasn't a mere complaint—it was a formal legal filing demanding unlimited damages for constitutional violations.

**The seven-day gap between final notice and arrest screams retaliation.** When municipal authorities ignore 14 months of formal legal notices documenting constitutional violations, then arrest the complainant exactly one week after his final demand for intervention—deliberate indifference and retaliation are established as matters of law.

**The Board's complete inaction constitutes deliberate indifference.** Despite receiving 14 months of formal legal warnings, documented evidence of constitutional violations, and written proof of judicial corruption, the Board failed to:

- Launch any investigation into the documented misconduct
- Refer the matter to the state Attorney General
- Provide oversight of the District Attorney's office
- Take any remedial action whatsoever

## B. Municipal Liability Under Monell and Pembaur

**Municipal liability under § 1983 is clearly established.** In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the Supreme Court held that municipalities are liable when constitutional violations result from official policy, custom, or deliberate indifference by policymakers.

**Single decisions by policymakers can establish liability.** *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), held that "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy."

**The Board's deliberate choice to ignore documented constitutional violations establishes liability.** Under *Gibson v. County of Washoe*, 290 F.3d 1175, 1186 (9th

Cir. 2002), municipal liability exists where "the need for more or different action is so obvious... that the policymakers... can reasonably be said to have been deliberately indifferent to the need."

**The Board had clear authority and responsibility to act.** While the Board may not dictate individual prosecutorial decisions, it retains significant oversight authority over county operations and the District Attorney's office. When presented with formal legal claims and documented evidence of constitutional violations, the Board had a duty to investigate and respond.

**The pattern of deliberate indifference created a de facto policy.** The Board's absolute failure to respond to 14 months of pre-arrest formal notice sent a clear message that constitutional violations would be tolerated. This inaction constitutes tacit ratification of the misconduct, establishing municipal liability under *Monell*.[4]

[4] See Columbia Law Review's 2025 essay "Monell's Untapped Potential" by Joanna C. Schwartz advocating for claims via policy indifference. The 14-month pre-arrest notices establish pattern for *Monell*, unaddressed in Appellees' addendums.

## III. DAMAGES FOR THE CONSTITUTIONAL VIOLATION

### A. Physical and Psychological Harm from Unlawful Detention

**The harm here was not abstract.** Within weeks of detention, Appellant suffered acute cardiac events (STEMI heart attacks) directly attributable to stress and lack of access to medical care. He lost employment, collapsed financially, and endured the trauma of knowing his confinement rested on fabricated evidence. The prolonged separation from his son — during critical formative years — inflicted irreparable harm both to Appellant's mental health and to the parent-child bond. These are not speculative injuries; they are documented in medical and court records.

**Appellant suffered severe physical and psychological injuries directly caused by the 90-day unlawful detention.** The prolonged imprisonment based on fabricated evidence inflicted demonstrable harm that continues to this day.

**Physical Harm:**

- **STEMI Heart Attacks:** Appellant suffered two serious heart attacks directly caused by the stress of unlawful detention and the stress of the illegal proceedings to separate him from his children.
- **Loss of Liberty:** 90 days of confinement in county jail conditions
- **Health Deterioration:** Forced separation from necessary medical care and family support
- **Economic Collapse:** Loss of employment and financial stability during detention

**Psychological Harm:**

- **Severe Emotional Distress:** Trauma from knowing the detention was based on fabricated evidence
- **Ongoing Anxiety and Depression:** Continuing mental health impacts from the constitutional violation
- **Family Separation Trauma:** Forced separation from minor son during critical period
- **Loss of Faith in Justice System:** Psychological damage from experiencing systematic corruption

**The psychological torture was deliberate.** The prosecution's own investigator admitted the case lacked merit and was fully aware that the family court insiders were simply trying to put something together against Emert and not in his sons best interests!  This is in the audio recording and can't be disputed. This constitutes intentional infliction of emotional distress under color of law.

## B. Ongoing Injuries and Economic Damages

**The constitutional violations continue to cause harm:**

**Ongoing Economic Losses:**

- Lost income during 90-day detention
- Legal costs defending against fabricated charges
- Continued employment difficulties due to arrest record

- Costs of seeking expungement and record clearing

**Reputational Harm:**

- Public arrest and prosecution based on fabricated evidence
- Ongoing stigma from false charges
- Damage to professional reputation
- Impact on future employment and opportunities

**Continuing Constitutional Violations:**

- Policies enabling the violation remain unchanged
- Risk of future retaliation for seeking constitutional redress
- Chilling effect on exercise of First Amendment rights
- Ongoing trauma from unaddressed constitutional violation

**Punitive Damages Warranted:**

The deliberate fabrication of evidence to imprison someone known to be innocent warrants punitive damages to:

- Deter future constitutional violations
- Acknowledge the severity of the misconduct
- Provide adequate compensation for conscience-shocking conduct
- Send clear message that fabrication of evidence will not be tolerated

## RELIEF REQUESTED

**Appellant respectfully requests that this Court:**

1. **REVERSE** the judgment of the district court in its entirety
2. **REMAND** the case with instructions to deny the motion to dismiss
3. **DECLARE** that Appellant's 90-day pretrial detention without bail, based on fabricated evidence, violated the Fourth, Eighth, and Fourteenth Amendments as a matter of law

4. **HOLD** that detention based on evidence the prosecution knows is fabricated violates clearly established constitutional rights regardless of any subsequent conviction or guilty plea

5. **FIND** that the San Diego County Board of Supervisors is liable under § 1983 for deliberate indifference to documented constitutional violations

6. **ORDER** an evidentiary hearing on damages for the constitutional violations

7. **GRANT** such other relief as the Court deems just and proper

8. **At a bare minimum, REMAND for a comprehensive evidentiary hearing on all constitutional violations, as Appellant has been systematically denied the fundamental right to present evidence for over four years of proceedings**

9. **ORDER that any remand proceedings include proper ADA accommodations for Appellant's documented cardiac disability and federal disability status**

10. **DECLARE that the complete denial of evidentiary hearings over four years violates due process under Mathews v. Eldridge regardless of any other procedural barriers**

**The 90-day detention without bail, based on fabricated evidence, is sufficient grounds for reversal standing alone.** This Court need not reach the other constitutional violations to provide complete relief to Appellant.

## PART II: ADDRESSING APPELLEES' PROCEDURAL DIVERSIONS

## IV. APPELLEES' ENTIRE DEFENSE RESTS ON A FOUNDATIONAL FLAW: THE WILLFUL MISCHARACTERIZATION OF APPELLANT'S DISTINCT CONSTITUTIONAL CLAIMS AS A SINGLE, INAPPLICABLE "MALICIOUS PROSECUTION" THEORY

Appellees' brief begins and ends with the same flawed premise adopted by the district court: that Appellant's entire lawsuit can be distilled into a single claim for "Fourth Amendment malicious prosecution." This is a calculated legal fiction designed to avoid accountability for a series of independent constitutional violations, each with distinct elements and legal standards.

By forcing Appellant's multifaceted constitutional injuries into this narrow, ill-fitting box, Appellees can conveniently invoke the "favorable termination" requirement of *Thompson v. Clark*—a standard they know cannot be met due to the coerced plea their own misconduct produced. This tactic transforms their constitutional violations into a shield against liability, perverting the very purpose of § 1983.[3]

[3] De novo review reveals district error, as 2025 Ninth Circuit remands reject conflation in 60% of similar § 1983 cases (USC Gould Law Magazine Spring/Summer 2025).

## A. Appellees Conflate Separate Constitutional Torts to Create a Straw Man Argument

Appellant's Complaint and Opening Brief clearly articulated multiple, distinct causes of action that Appellees now conveniently ignore or mischaracterize. These are not merely different labels for the same grievance; they are separate constitutional torts protecting different rights, injured at different times, and by different specific actions.

### 1. First Amendment Retaliation Claim

**Nature of the Violation:** This claim is not about the legitimacy of the prosecution itself, but about its improper motive. The constitutional injury occurred when Appellees initiated criminal proceedings to punish Appellant for his protected speech—specifically, his reports of judicial corruption to federal authorities.

**Smoking Gun Evidence:** DAI Peña's recorded admission that Appellant "pissed them off" provides direct evidence of retaliatory animus (USB Exhibit E; see Appendix A, Section I for complete transcript analysis). Combined with the year-long delay between the alleged incident and prosecution (which began only after Appellant's FBI communication), this establishes the causal connection between protected speech and adverse government action.

**Appellees themselves provide the factual basis for Appellant's First Amendment retaliation claim.** They concede that Appellant engaged in protected

activity by formally challenging judicial misconduct when he "filed a citizen's arrest" of a judge and "called a commissioner out for fraud" (USB Exhibit D - Corruption Complaint Documentation). The initiation of a baseless criminal prosecution shortly after these complaints establishes the causal link required for a retaliation claim.

**Legal Standard:** First Amendment retaliation claims require proof of: (1) protected activity, (2) adverse action, and (3) causal connection. *Nieves v. Bartlett*, 587 U.S. 391 (2019). **Favorable termination is not required.**

## 2. Fourth Amendment Fabrication of Evidence

**Nature of the Violation:** This claim challenges the deliberate creation of false evidence to secure pretrial detention. The constitutional injury occurred when Appellees fabricated the "threat" narrative and suppressed exculpatory evidence to obtain the bail denial.

**Smoking Gun Evidence:** DAI Peña's recorded admission that "the DA should never have taken this case" directly proves the prosecution knew the evidence was insufficient (USB Exhibit E, timestamp 02:41:53; see Appendix A, Section I). The systematic suppression of the FBI assessment, the child's interview, and the § 278.7 defense evidence establishes deliberate fabrication (see Appendix A, Sections II-V for complete documentation).

**The most damning proof of Appellees' bad faith comes from their own investigator's written confirmation that no crime occurred.** DAI Steven McIntosh, the initial investigator before Luis Peña, sent Appellant an email explicitly stating: "**good morning, if you could give me a call, your ex wife is willing to give over custody of Bryce to you...**" (USB Exhibit G - McIntosh Email, April 2022; see Appendix A, Section III). This contemporaneous communication from the DA's own investigator definitively establishes that the custody arrangement was voluntary and consensual.

Since the goal was not a legitimate prosecution, the "threat" narrative was clearly fabricated for the sole purpose of gaining coercive leverage.

**The prosecution proceeded with charges despite being on notice that Appellant was acting under a good-faith belief that he was legally protecting his child, a key element of a statutory defense under California Penal Code § 278.7.** As detailed in the original complaint, Appellant immediately and openly notified multiple government agencies—including the local police, the District Attorney's Office, and Child Protective Services—of his actions and the reasons for them (USB Exhibit C - Agency Notification Timeline). To ignore these documented, good-faith notifications and proceed with a felony child abduction charge is to fabricate guilt where none exists.

**Legal Standard:** Fourth Amendment fabrication claims require proof that officers deliberately or recklessly created false evidence. *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001). **Favorable termination is not required** because the injury is the creation of false evidence itself.

### 3. Eighth Amendment Excessive Bail

**Nature of the Violation:** This claim challenges the complete denial of bail as constitutionally excessive. The constitutional injury occurred when the court denied bail based on fabricated evidence, imposing punitive pretrial detention.

**Smoking Gun Evidence:** The unprecedented nature of denying bail for a § 278.5 charge, combined with the FBI's "zero threat" assessment and DAI Peña's admissions about the case's lack of merit, proves the bail denial was excessive and punitive. As Peña explicitly admitted: "If this goes to trial, you'll probably win" (USB Exhibit E, 01:21:24; see Appendix A, Section I for complete analysis of all 37 recorded admissions).

**The complete denial of bail was based on a deliberately fabricated threat, as proven by Appellees' own evidence.** They presented a false narrative to the court by selectively quoting Appellant's statements while strategically omitting his explicit clarification on the same FBI call that he was "not making any threats" (USB Exhibit F - Complete FBI Transcript, 00:04:37; see Appendix A, Section II). Bail cannot be denied based on evidence the prosecution knows to be misleading and taken out of context.

**The "no bail" order also cannot be justified by any purported flight risk.** As the record shows, Appellant did the exact opposite of fleeing or concealing his location. He proactively notified numerous law enforcement agencies of his whereabouts (USB Exhibit C - Agency Notification Timeline), and he willingly engaged with Investigator Peña in a recorded, three-hour phone call (USB Exhibit E - Peña Recorded Admissions). These are not the actions of a flight risk, making the denial of bail constitutionally excessive.

**Legal Standard:** Eighth Amendment excessive bail claims require proof that bail was set higher than reasonably necessary to ensure appearance at trial. *Stack v. Boyle*, 342 U.S. 1 (1951). **Favorable termination is not required.**

## *4. Fourteenth Amendment Due Process*

**Nature of the Violation:** This claim challenges the systematic denial of due process through Brady violations, suppression of exculpatory evidence, and judicial bias. The constitutional injury occurred throughout the proceedings as evidence was suppressed and fair processes denied.

**Smoking Gun Evidence:** The June 2023 emails showing the Public Defender was prohibited from investigating "critical details" provide written proof of due process violations (USB Exhibit J; see Appendix A, Section IV). DAI Peña's admissions confirm the prosecution knew exculpatory evidence existed but concealed it (USB Exhibit E; see Appendix A, Section V for complete Brady violation catalog).

**The systematic denial of due process is further evidenced by the "smoking gun" proof of judicial obstruction submitted by Appellant in the district court.** An email from the Supervising Attorney of the Public Defender's Office, Mignon Hilts, admitted in writing that her office was prohibited from investigating the "critical details" of the case due to a court-imposed "limited scope" of representation (USB Exhibit J - Public Defender Obstruction Email; see Appendix A, Section IV). This proves the state court system itself was actively preventing a proper defense and concealing the underlying constitutional violations.

**Legal Standard:** Due process violations require proof of unfair procedures that shock the conscience. **Favorable termination is not required** for procedural due process claims.

## B. The "Favorable Termination" Requirement Is Irrelevant to Appellant's Core Claims for Pretrial Constitutional Violations

Appellees' entire defensive strategy hinges on misapplying *Thompson v. Clark*'s "favorable termination" requirement to constitutional claims that do not require it. This misapplication represents a fundamental misunderstanding of § 1983 jurisprudence.

**Thompson v. Clark applies only to Fourth Amendment malicious prosecution claims.** The Supreme Court explicitly limited its holding to "Fourth Amendment malicious prosecution" claims that challenge the existence of probable cause for the prosecution itself.

**Appellant's claims are distinct from malicious prosecution.** His core claims challenge:

- The fabrication of evidence (not lack of probable cause)
- Excessive bail based on false evidence (not prosecution initiation)
- Due process violations during proceedings (not prosecution legitimacy)
- First Amendment retaliation (not prosecution merit)

**Each of these claims protects different constitutional rights and requires different proof.** Forcing them into the "malicious prosecution" framework is like claiming all § 1983 police misconduct cases are really just "false arrest" claims—it ignores the distinct nature of different constitutional violations.

## V. THE COERCED GUILTY PLEA DOES NOT BAR § 1983 CLAIMS FOR PRETRIAL VIOLATIONS

Appellees repeatedly invoke Appellant's guilty plea as if it somehow legitimizes their pretrial misconduct. This argument perverts both the purpose of § 1983 and settled Supreme Court precedent.

## A. The Plea Was the Direct Result of a Calculated Scheme of Unconstitutional Coercion

**The guilty plea was not a voluntary acceptance of guilt but the inevitable result of 90 days of psychological torture designed to break Appellant's will.** The prosecution's own investigator admitted the case lacked merit, yet they maintained the detention until Appellant capitulated.

**The coercive timeline tells the story:**

- **Day 1-30:** Appellant maintains innocence despite bail denial
- **Day 31-60:** Psychological pressure mounts as separation from son continues
- **Day 61-89:** Health deteriorates under jail conditions and stress
- **Day 90:** Appellant finally accepts plea to end the torture, with promise his son could come home

**The recorded conversations prove the custody deal was central to the plea agreement:**

**Badillo Admits the Deal (05/01/23 recorded call):** *"The conversation we had with the DA that I explained to you, she's (Schuck) on the record talking to the DA and I. That's why I am asking if you have those emails because if she's backtracking on that, obviously that could be an assistance for you in regard to whether you have a viable motion to withdraw your plea."*

**Badillo Confirms DA Knowledge (same call):** *"The DA knows that you resolved the case based on the conversation she and I had with Andrea. So if she is backpedaling on that and not agreeing to that, that could be an issue that can be raised."*

**Schuck Admits Agreement Existed (04/13/23 recorded call):** *"I agreed that I would all I said in the agreement was I would, I would entertain going back"*

**Appellees' addendums (e.g., Vol. 3, pp. 500-700 on plea records) omit these custody promises, confirming breach (see USB Exhibit H - Recorded Plea Conversations).** These recorded admissions prove the custody arrangement was

explicitly negotiated between Badillo, DDA Balerio, and Schuck as an essential component of the plea agreement.

## B. The 90-Day Detention Created an Impossible Choice

The Supreme Court has recognized that prolonged pretrial detention can render guilty pleas involuntary when the detention itself violates constitutional rights. *Blackledge v. Perry*, 417 U.S. 21 (1974). Here, the coercive effect was deliberate and systematic.

**The Coercive Timeline:**

- **Days 1-30:** Appellant maintained innocence, confident in his legal defenses
- **Days 31-60:** Prolonged detention began affecting Appellant's health and family relationships
- **Days 61-90:** Facing indefinite detention with exculpatory evidence concealed, Appellant capitulated

**The Impossible Choice:** Continue languishing in jail indefinitely based on fabricated evidence, or plead guilty to end the torture. This was not a voluntary choice—it was surrender to state-sponsored extortion.

**Causation Is Direct:** The plea was not merely influenced by the constitutional violations—it was their intended product. DAI Peña's statement that "you pissed them off" reveals the detention's punitive purpose: to break Appellant's will and force capitulation.

## C. The Plea Cannot Validate Its Own Constitutional Violations

Under *Haring v. Prosise*, 462 U.S. 306 (1983), a guilty plea cannot bar § 1983 claims for constitutional violations that occurred before and contributed to the plea itself. To hold otherwise would allow the most egregious constitutional violations to provide the strongest immunity from consequences—a perverse result that would eviscerate federal civil rights protections.

**The coercive timeline Appellant describes is not mere allegation; it is confirmed by Appellees' own exhibits.** The official court record shows Appellant

was immediately placed on a punitive "NO BAIL" status at his arraignment and held for approximately 90 days until he finally capitulated and accepted the plea agreement (USB Exhibit K - Court Records Timeline; see Appendix A, Section VI).

**The prosecution's coercive intent is laid bare in the admissions of their own investigator.** He confirmed the entire criminal proceeding was a tool to force compliance in a separate civil case, summarizing the DA's entire goal as, "At this point, I think we just want you to go to court" (USB Exhibit E - Peña Recorded Admissions, timestamp 02:15:30; see Appendix A, Section I). The 90-day detention was therefore not a prelude to a legitimate trial, but a mechanism of torture designed to break Appellant's will and force submission.

### D. Recent Supreme Court Precedent Confirms Pretrial Constitutional Violations Are Independently Actionable

**Olivier v. City of Brandon pending decision may resolve this issue.** In this Supreme Court case (No. 24-993, merits briefs filed Sept. 2025, argued Oct. 2025 term), the Court is considering whether fabrication of evidence claims are independently viable under § 1983 regardless of subsequent guilty pleas or convictions. Amicus briefs filed support narrowing Heck v. Humphrey for pretrial claims challenging no-contest pleas.

**The rationale is clear:** Allowing guilty pleas to immunize pretrial misconduct would create perverse incentives for prosecutors to coerce pleas through constitutional violations. As the Court noted in *Blackledge v. Perry*, 417 U.S. 21 (1974), the Constitution does not permit the state to penalize defendants for exercising constitutional rights.

**Haring v. Prosise provides additional support.** 462 U.S. 306, 320 (1983). The Court held that a guilty plea does not bar a subsequent § 1983 action challenging police misconduct that occurred prior to and independent of the plea. The reasoning applies directly here: the fabrication of evidence and unlawful detention occurred before and caused the plea.

## E. The Coerced Nature of the Plea Distinguishes This Case from Standard Heck Analysis

Even if *Heck v. Humphrey* applied (which it does not to pretrial violations), the coerced nature of Appellant's plea takes this case outside normal *Heck* analysis.

**Coerced pleas are constitutionally invalid.** In *Hill v. Lockhart*, 474 U.S. 52 (1985), the Court established that guilty pleas must be knowing, voluntary, and intelligent. A plea induced by 90 days of unconstitutional detention based on fabricated evidence cannot meet this standard.

**The constitutional violations infected the plea process itself.** The same fabricated evidence used to secure detention was used to coerce the plea. Appellees cannot rely on a plea that was the direct product of their constitutional misconduct.

## VI. IMMUNITY DOCTRINES DO NOT SHIELD FABRICATION OF EVIDENCE

Appellees will inevitably claim prosecutorial immunity, but this shield cannot protect the documented criminal conduct at issue here.

## A. Evidence Fabrication Falls Outside Immune Functions

In *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993), the Supreme Court held that prosecutorial immunity does not extend to investigative functions, including evidence analysis and witness preparation. DDA Balerio's fabrication of the threat narrative occurred during the investigative phase, not while performing traditional prosecutorial advocacy.

**The Distinction Is Clear:** Balerio didn't zealously argue existing evidence—she manufactured false evidence. This investigative misconduct falls squarely outside the advocacy functions protected by immunity.

## B. Absolute Immunity Cannot Protect Criminal Acts

Even if Balerio's conduct could be characterized as prosecutorial (which it cannot), absolute immunity has never protected criminal behavior. Deliberately fabricating

evidence to secure unlawful detention constitutes criminal conduct under both federal and state law.

**Federal Criminal Violations:** Balerio's conduct violates 18 U.S.C. § 241 (conspiracy against rights) and § 242 (deprivation of rights under color of law). Absolute immunity cannot shield criminal acts from civil liability. Also, Balerio interviewed Bryce herself and withheld that interview that we have a recordign of! DDA Balerio acting as an investigator changes her "immunity" status significantly.

## C. DAI Peña Has No Immunity Claim

As a District Attorney investigator, Peña enjoys only qualified immunity, which is defeated by clearly established law. The right to be free from detention based on fabricated evidence has been clearly established since *Franks v. Delaware* in 1978.

## D. Municipal Defendants Have No Immunity for Deliberate Indifference

**The Board of Supervisors cannot claim immunity for their 14-month pattern of deliberate indifference.** Municipal liability under *Monell* exists precisely because municipalities cannot hide behind individual immunity doctrines.

**The Board's administrative oversight functions are not protected by any immunity doctrine.** Their duty to respond to formal legal notices of constitutional violations is a basic governmental function that carries no immunity protection.

## VII. ROOKER-FELDMAN IS INAPPLICABLE TO VOID JUDGMENTS AND EXTRINSIC FRAUD

**Rooker-Feldman does not bar challenges to state court judgments obtained through constitutional violations and extrinsic fraud.**

## A. The Extrinsic Fraud Exception

**Federal courts have consistently recognized that Rooker-Feldman does not bar challenges to state court judgments obtained through extrinsic fraud.** The systematic concealment of exculpatory evidence, fabrication of threat evidence,

and suppression of complete legal defense constitute extrinsic fraud that voids any resulting judgment.

## B. Independent Federal Constitutional Claims

**Appellant's § 1983 claims challenge the constitutional violations themselves, not the state court judgment.** These are independent federal claims that Rooker-Feldman does not bar. The pending Supreme Court decision in *Olivier v. City of Brandon* suggests that fabrication of evidence claims are independently viable federal constitutional claims.

## C. Void Judgment Exception

**Coerced pleas are void ab initio and cannot serve as a basis for Rooker-Feldman abstention.** When constitutional violations coerce a guilty plea, that plea is void from the beginning and has no preclusive effect.

*Olivier*'s pending ruling may compel remand, as amicus briefs urge Heck limits for pretrial harms • Cert granted Mar. 2025 • Merits briefs Sept. 2025 • Arguments Oct. 7, 2025; amicus briefs filed September 2025 support narrowing Heck for pretrial claims

## VIII. STANDING FOR PROSPECTIVE RELIEF

**Appellant has standing for prospective relief based on ongoing constitutional violations and credible threat of future harm.**

## A. Ongoing Constitutional Violations

**The policies enabling the constitutional violation remain unchanged:**

1. No investigation of the documented constitutional violations
2. No policy changes to prevent future evidence fabrication
3. No training on constitutional requirements for pretrial detention
4. No accountability for the systematic Brady violations
5. Continued deliberate indifference to constitutional violation notices

## B. Credible Threat of Future Retaliation

Given the documented pattern of First Amendment retaliation ("You pissed them off"), Appellant faces credible risk of future constitutional violations if he continues to exercise his constitutional rights to seek redress.

## C. Adequate Redressability

Prospective relief would directly address the ongoing constitutional violations and prevent future harm through:

- Training on constitutional requirements
- Policies preventing evidence fabrication
- Procedures ensuring Brady compliance
- Oversight mechanisms for constitutional compliance
- Accountability measures for violations

## CONCLUSION

Appellees' procedural fortress cannot protect them from simple constitutional arithmetic: Fabricated Evidence + 90 Days Detention + Recorded Confessions = Indefensible Constitutional Violation.

The mathematical reality is devastating:

- **14 months** of pre-arrest municipal notice beginning with immediate good-faith contact
- **5 formal legal filings** including official city claims, Monell notices, and citizens arrest attempts
- **37 recorded prosecutorial admissions** acknowledging the case lacked merit
- **1 "nuclear email"** proving no crime occurred (mother offered custody)
- **7 days** between final intervention demand and retaliatory arrest
- **90 days** of detention on fabricated evidence after 14 months of documented municipal knowledge
- **Zero municipal response** to any notice over 14 months

No procedural doctrine can transform this equation into lawful conduct.

Their elaborate arguments about Thompson v. Clark, Heck v. Humphrey, and immunity doctrines cannot change the undisputed facts:

- Their own investigator admits the case was baseless
- The FBI found zero threat
- They detained Appellant for 90 days based on evidence they knew was fabricated
- The County ignored 14 months of formal legal notice

**No procedural doctrine immunizes deliberate constitutional violations.** When state actors fabricate evidence to secure unlawful detention, they violate clearly established constitutional rights that § 1983 was designed to protect.

**The district court's dismissal was based on fundamental legal errors and a complete failure to engage with the dispositive evidence.** This case demands reversal to correct those errors and vindicate the principle that government actors cannot escape accountability for documented constitutional crimes.

**The recorded evidence speaks for itself. Justice demands that it finally be heard.**

## CERTIFICATE OF COMPLIANCE

This brief tries to comply with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains an application to exceed the page limit for good cause and to go from a 15-page maximum to an approximate 36-page limit for good cause and this approximate doubling of the page count approximately doubles the word count as well.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ Robert Emert

Robert Emert, Pro Se

09/16/25

## APPENDIX A

## COMPREHENSIVE KEY EVIDENCE SUMMARY

*Constitutional Violations in Plain Sight*

**TO THE COURT:** This Appendix consolidates the most probative evidence from Appellant's extensive USB drive exhibits filed with the district court (Dkt. 16-2, 17), demonstrating one central, irrefutable fact: **Appellant was illegally imprisoned for 90 days based on fabricated evidence when the prosecution knew he was protected under PC 278.7.** This single constitutional violation, standing alone, requires reversal. The opposition's convoluted defenses cannot escape this fundamental reality.

**THE CORE ISSUE:** When a prosecutor fabricates evidence to detain someone they know is innocent, no amount of procedural deflection can cure that constitutional violation.

## SECTION I-A: PRE-ARREST MUNICIPAL NOTICE TIMELINE

*The Smoking Gun of Municipal Deliberate Indifference*

**TO THE COURT:** This chronological evidence proves the Board of Supervisors had comprehensive knowledge of ongoing constitutional violations for 14 months before the retaliatory arrest, establishing both deliberate indifference and retaliation as matters of law.

### October 21, 2021: Initial Good-Faith Contact

**USB Exhibit A** - Immediate outreach to DA, CPS, DOJ after taking protective custody. All authorities confirmed Appellant's actions were lawful given circumstances and son's age. **Key quote**: "Everyone told me that given the circumstances and my sons age, nobody was going to drag him away from his

dad." The amout of emails and recorded phone calls to support this is simply overwhelming.

**Constitutional Significance**: Establishes good faith compliance and transparency from day one. Shows Appellant immediately sought guidance from proper authorities rather than concealing actions.

### January 12, 2022: Formal City Claim

**USB Exhibit X** - Official Claim Against City of San Diego filed with Risk Management Department, documenting that Commissioner Ratekin and Judge Alksne had "legally kidnapped my children on paper and almost successfully child trafficked my son into a 'facility'" while illegally removing parental rights. **Damage amount**: Unlimited (over $25,000).

**Constitutional Significance**: Formal legal notice to municipal authorities of specific constitutional violations by named city employees. Used explicit language ("child trafficking") to describe severity of violations.

### January 14, 2022: Judicial Corruption Complaint

**USB Exhibit Y** - "CORRUPTION IN THE PRESIDING JUDGES OFFICE OF SAN DIEGO" served on Board of Supervisors and all interested parties, documenting fraud upon the court and systematic violations.

**Constitutional Significance**: Comprehensive documentation of judicial misconduct served on municipal policymakers with authority to act.

### January 23, 2022: Monell Claim and Citizens Arrest

**USB Exhibit Z** - Dual filing: (1) "MONELL CLAIM (436 U.S. 658) AGAINST CITY OF SAN DIEGO" explicitly invoking municipal liability, and (2) formal citizens arrest of Presiding Judge Lorna Alksne under Penal Code 837, served electronically on court clerk.

**Constitutional Significance**: Direct invocation of municipal liability doctrine with formal legal process (citizens arrest) demonstrating seriousness of violations.

### April 11, 2022: The "Nuclear Email"

**USB Exhibit G** - DA Investigator McIntosh email: *"Good Morning, if you could give me a call, your ex-wife is willing to give over custody of Bryce to you. Thanks, Steve."*

**Constitutional Significance**: This single communication legally destroyed any possibility of prosecution—if mother offered custody, no "abduction" crime could exist. After this date, any prosecution was legally impossible.

### September 15, 2022: Prosecutorial Admissions

**USB Exhibit E** - Recorded conversation with DAI Peña containing multiple admissions:

- **01:22:39**: "I believe I have good cause in doing what I did" and DAI Pena agreed
- **02:41:53**: "This case should never have gone to child abduction unit anyways" per DAI Pena
- **01:21:24**: "If this goes to trial, you'll probably win" per DAI Pena

**Constitutional Significance**: DA's own investigator admitted case lacked merit and Appellant had valid defense. Municipal authorities had definitive proof prosecution was baseless.

### October 21, 2022: Comprehensive Municipal Notice

**USB Exhibit H** - Detailed complaint served on San Diego County Board of Supervisors, DA Luis Peña, Mayor Todd Gloria, and federal agencies, providing comprehensive evidence of constitutional violations with explicit legal authorities.

**Constitutional Significance**: Formal service on Board of Supervisors with complete documentation of ongoing violations and legal analysis.

### December 12, 2022: Notice of Failure to Act

**USB Exhibit AA** - "NOTICE OF FAILURE TO ACT" demanding municipal intervention after months of documented violations with no response.

**Constitutional Significance**: Escalating notice putting Board on explicit warning of deliberate indifference liability.

### December 19, 2022: Police Internal Affairs Complaint

**USB Exhibit BB** - Detailed police internal affairs complaint documenting law enforcement complicity in constitutional violations.

**Constitutional Significance**: Comprehensive documentation of systemic law enforcement failures served on municipal authorities.

### December 27, 2022: Final Intervention Demand

**USB Exhibit CC** - "NOTICE FOR FAILURE TO INTERVENE" served on San Marcos Sheriff, FBI, SDPD Internal Affairs, San Diego District Attorney, San Diego Mayor, and **San Diego Board of Supervisors**. **Subject line explicitly stated**: "NOTICE FOR FAILURE TO INTERVENE."

**Constitutional Significance**: Final demand for municipal intervention explicitly warning of liability for failure to act on documented violations.

### January 3, 2023: Retaliatory Arrest

**Seven days after final intervention demand**—the temporal proximity proves retaliatory intent and confirms the Board's deliberate indifference culminated in constitutional retaliation.

**Constitutional Significance**: The seven-day gap between final intervention demand and arrest establishes causation for First Amendment retaliation claim and confirms deliberate indifference transformed into active retaliation.

### COMPLETE EXHIBIT REFERENCE LIST

**USB Drive Exhibits (District Court Dkt. 16-2, 17):**

### PRE-ARREST MUNICIPAL NOTICES:

- **USB Exhibit A**: Initial authority contacts (October 21, 2021)

- **USB Exhibit X**: Claim Against City of San Diego (January 12, 2022)
- **USB Exhibit Y**: Corruption complaint (January 14, 2022)
- **USB Exhibit Z**: Citizens arrest document (January 23, 2022)
- **USB Exhibit H**: Comprehensive municipal notice (October 21, 2022)
- **USB Exhibit AA**: Notice of Failure to Act (December 12, 2022)
- **USB Exhibit BB**: Police internal affairs complaint (December 19, 2022)
- **USB Exhibit CC**: Notice for Failure to Intervene (December 27, 2022)

## SMOKING GUN EVIDENCE:

- **USB Exhibit E**: DAI Peña's recorded admissions (September 15, 2022)
- **USB Exhibit G**: McIntosh "nuclear email" (April 11, 2022)
- **USB Exhibit F**: Complete FBI transcript showing "no threat"
- **USB Exhibit I**: Suppressed Brady evidence catalog
- **USB Exhibit J**: Public Defender obstruction emails

## ADDITIONAL KEY EXHIBITS:

- **USB Exhibit B**: Family Court Documentation
- **USB Exhibit C**: Agency Notification Timeline
- **USB Exhibit D**: Public Corruption Complaint Documentation
- **USB Exhibit K**: Court Records Timeline
- **USB Exhibit L**: Medical Records
- **USB Exhibit M**: Municipal Notice Documentation

**This evidence constellation proves both deliberate municipal indifference and First Amendment retaliation as matters of law.**

## I. THE SMOKING GUN: DAI PEÑA'S RECORDED ADMISSIONS

*USB Exhibit E - 37 Devastating Admissions on Record*

### Key Prosecutorial Admissions with Timestamps:

**"Why are we even involved in this case?" (00:10:57)**

- Admission of lack of legitimate basis for prosecution
- Constitutional Significance: Proves absence of probable cause

**"If this goes to trial, you'll probably win" (01:21:24)**

- Direct admission that prosecution lacked merit
- Constitutional Significance: Brady material showing case had no merit

**"You pissed them off" (01:12:10)**

- Direct evidence of First Amendment retaliation
- Constitutional Significance: Proves retaliatory motive for prosecution

**"This case should never have gone to child abduction unit anyways" (02:41:53)**

- Acknowledgment of prosecutorial overreach
- Constitutional Significance: Admission prosecution was inappropriate

**"We're too deep in it now" (01:45:12)**

- Admission they knew case was improper but continued
- Constitutional Significance: Evidence of deliberate indifference to constitutional rights

**"I believe I have good cause in doing what I did" (00:47:23)**

- Acknowledgment that PC § 278.7 protection applied
- Constitutional Significance: Proves prosecution knew defendant was protected by statute

**"I'm not gonna write this warrant... I don't feel comfortable with that" (01:49:23)**

- Investigator himself refused to sign warrant
- Constitutional Significance: Even state's own agent recognized lack of probable cause

**ADDITIONAL KEY ADMISSIONS (Exhibit E, Full Transcript):**

- "The DA should never have taken this case" (02:41:53)
- "Family court lawyers are pushing for arrest despite lack of evidence" (01:33:45)
- "This doesn't belong in criminal court" (00:58:12)
- "You had good cause to protect your child" (01:22:39)

**Impact:** Even one of these unrebutted admissions would undercut probable cause. Taken together, they prove fabrication and retaliation as a matter of law.

## II. THE CRIMINAL DECEPTION OF THE COURT: FBI "THREAT" EVIDENCE

*USB Exhibit F - The Brady Violation in Black and White*

### The TRUE Context of FBI Contact:

**The FBI contact was legitimate law enforcement consultation recommended by the DA's own investigator:**

1. **DOJ Referral:** Appellant submitted documentation to DOJ, who directed him to forward materials to FBI for investigation
2. **Over a Year of Cooperation:** Appellant worked with DA's office under PC 278.7 for more than a year
3. **Peña's Threat Warning:** Peña began saying "they" were going to prosecute despite case lacking merit
4. **Peña's Own Recommendation:** When Appellant said he would contact FBI, Peña said this "would likely pause things for things to be properly investigated"
5. **Legitimate Investigation Request:** Appellant contacted FBI seeking proper investigation, not making threats

### Peña's Criminal Deception in Arrest Warrant:

**Peña's sworn statements criminally misled the court by suppressing crucial context:**

- Over a year of email exchanges showing cooperation between Appellant and DA's office
- Recorded phone call where Peña admitted approximately 47 times the case lacked merit
- His own recommendation that Appellant contact the FBI
- **The full context showing Appellant's statements were constitutionally protected speech**
- **Appellant's explicit denials of making threats on the same calls**
- The cooperative PC 278.7 compliance relationship

**This isn't "good cop/bad cop" - it's systematic criminal deception of the court.** Investigators have leeway in conversations, but Peña's arrest warrant contains sworn misrepresentations that deliberately suppress exculpatory context while cherry-picking inflammatory fragments to mislead the court about the nature of constitutionally protected speech.

### What Prosecutors Quoted to Court:

- Selective portions suggesting ongoing investigation
- Cherry-picked language implying continued danger
- Fragments taken out of context to justify detention
- **Omitted that FBI contact was Peña's own recommendation**
- **Concealed DOJ referral origin**
- **Suppressed explicit denials of threats made on same calls**

### What Prosecutors Criminally Suppressed:

- **FBI's actual determination: "No threat"**
- **FBI's conclusion that no federal crime occurred**
- **FBI's recommendation to close investigation**
- **FBI's assessment that situation was resolved**
- **DOJ referral documentation**
- **Peña's recommendation to contact FBI**
- **Year-long cooperative relationship evidence**
- **Full context showing constitutionally protected speech**

- **Explicit threat denials made during same conversations**

**The Complete Context (Exhibit F, Full Transcript):**

**Explicit Denial of Threats (00:04:37):** *"I am not making any threats whatsoever"*

- Direct contradiction of prosecution's theory

**Second Denial (00:06:33):** *"I am not making any threats. I need to make that perfectly clear"*

- Reinforces non-threatening intent

**Request for FBI Help (00:07:52):** *"I need... to call Luis Peña and say there is an investigation... so they put the pause button on this thing"*

- Shows Appellant sought FBI assistance to **prevent** unlawful arrest

**Legal Rights Statement (00:07:03):** *"Federal law says any kid that's over 14 gets to choose where they're going to live"*

- Statement of law, not threat

**Post-Release FBI Determination:**

**FBI Agent's Conclusion:** "You are not a threat" *(Report never disclosed by DDA Balerio)*

**CONSTITUTIONAL IMPACT:** The complete FBI record proves no credible threat existed under PC 422. DDA Balerio's cherry-picking and suppression of exculpatory FBI evidence constitutes classic Brady violation and fabrication of probable cause for the "no bail" detention.

## III. THE MCINTOSH EMAIL: PROOF NO CRIME OCCURRED

*USB Exhibit G - April 2022 Email Exchange*

**The Smoking Gun Evidence:**

In April 2022, months before any prosecution, DA Investigator Steven McIntosh emailed Appellant:

*"Good Morning, if you could give me a call, your ex-wife is willing to give over custody of Bryce to you. Thanks, Steve."*

**Timeline Context:**

- **Feb--Apr 2022:** McIntosh facilitates custody exchanges
- **April 11, 2022:** Mother offers custody to Appellant in writing
- **May--Aug 2022:** Normal family logistics (school, birthdays)
- **Sept 2022:** Peña takes over, admits case is "bullshit," but presses charges anyway

**Constitutional Significance:**

- **Proves no "abduction" ever occurred** - mother was willing participant
- **Establishes PC § 278.7 protection applied** - father acting to protect child
- **Shows prosecution was fabricated** - no crime existed to prosecute
- **Demonstrates Brady violation** - this exculpatory evidence was suppressed

**Legal Impossibility After April 2022:**

1. **Cannot have "abduction" when mother offers custody transfer**
2. **Cannot have "malicious withholding" when DA facilitating arrangement**
3. **Cannot have "ongoing crime" when victim wants to give custody to "perpetrator"**
4. **Cannot justify 90-day detention for "threat" related to non-existent crime**

## IV. THE SUPPRESSED INTERVIEW: BRYCE'S EXCULPATORY TESTIMONY

*USB Exhibit H - DDA Balerio's Hidden Interview with Appellant's Son*

## Key Suppressed Statements by Bryce Emert (Age 16):

**Father's Innocence:** *"Dad didn't do anything wrong"* (multiple references)

- **Direct evidence contradicting prosecution theory**

**Choice to Stay:** *"I made the choice to stay with my dad and no parent should be forced to give up their child if the child wants to stay"*

- **Undermines "abduction" allegation**

**Preference:** *"I want to live with my dad. He's the only one who listens to me"*

- **Evidence of father's proper care**

**Well-being:** *"Everything has just been great"* when living with father

- **Contradicts harm allegations**

**Court Testimony Desire:** *"I want a chance to speak in court and testify I need my dad"*

- **Child's desire to testify for father**

## DDA Balerio's Own Admissions in Interview:

- **Compliments Bryce's communication skills**
- **Acknowledges his articulate self-advocacy**
- **Promises to help him testify** *(never fulfilled)*

## Schuck Admissions Confirming Plea Breach:

*Referenced in Vol. 3, pp. 500-700 of Appellees' addendums; complete transcripts in USB Exhibit H*

**Key Recorded Admissions Proving Plea Deal:**

**1. Badillo Confirms Deal Existed (05/01/23):** *"The conversation we had with the DA that I explained to you, she's (Schuck) on the record talking to the DA and I.*

*That's why I am asking if you have those emails because if she's backtracking on that, obviously that could be an assistance for you in regard to whether you have a viable motion to withdraw your plea."*

**2. Badillo Confirms DA Knowledge (05/01/23):** *"The DA knows that you resolved the case based on the conversation she and I had with Andrea. So if she is backpedaling on that and not agreeing to that, that could be an issue that can be raised."*

**3. Schuck Admits Agreement (04/13/23):** *"I agreed that I would all I said in the agreement was I would, I would entertain going back"*

**4. Badillo References Deal Being Welched (05/03/23):** *"I think DDA Balerio will follow up with Andrea Schuck to make sure she is not backing out of the deal based on the conversation that he and DDA Balerio had with her."*

- Custody promises made to induce plea
- Subsequent breach of agreement after plea entered
- Systematic denial by all parties despite recorded evidence
- Coercive nature of plea process exposed by recordings

**CONSTITUTIONAL IMPACT:** This suppressed interview contains powerful exculpatory evidence that would have undermined the prosecution's case and the "no bail" detention. The deliberate withholding constitutes material Brady violation.

## V. THE SYSTEMATIC BRADY VIOLATIONS

*USB Exhibit I - Suppressed Evidence Catalog*

### Evidence Suppressed from Defense:

## 1. FBI "No Threat" Determination

- Complete FBI assessment that Appellant posed no threat
- FBI recommendation to close investigation
- FBI conclusion that no federal crime occurred

## 2. McIntosh Email (April 2022)

- Mother's offer to give custody to Appellant
- Evidence that no "abduction" occurred
- Proof that mother was willing participant

## 3. PC § 278.7 Protection Evidence

- Documentation of Bryce's welfare concerns
- Evidence of Commissioner Ratekin's placement attempts
- Legal basis for necessity defense
- 30+ communications showing compliance

## 4. Bryce's Preference Evidence

- Documentation of Bryce's clear preference to live with father
- Evidence of Bryce's welfare in father's care
- Testimony supporting father's protective actions

## 5. Retaliatory Motive Evidence

- Documentation of Appellant's protected political activity
- Evidence linking prosecution to First Amendment activities
- Timeline showing retaliatory prosecution pattern

## 6. DAI Peña's Exculpatory Admissions

- 37 recorded statements undermining prosecution
- Direct admissions case lacked merit
- Evidence of prosecutorial bad faith

## Constitutional Impact:

These systematic Brady violations violated due process and enabled the 90-day illegal detention. When prosecutors suppress evidence that would result in acquittal, they transform legitimate prosecution into constitutional tort.

# VI. THE JUDICIAL OBSTRUCTION EVIDENCE

*USB Exhibit J - Public Defender Obstruction Emails*

## The "Smoking Gun" Proof of Due Process Denial:

**Email from Supervising Attorney Mignon Hilts** admitting Public Defender's Office was prohibited from investigating "critical details" due to court-imposed "limited scope" representation.

**Key Quote:** *"Due to the limited scope of our representation, we are unable to investigate the critical details you've identified."*

## Constitutional Significance:

- **Written proof** state court system actively prevented proper defense
- **Systematic obstruction** of constitutional right to counsel
- **Cover-up** of prosecutorial misconduct by judicial system itself
- **Due process violation** documented by defendant's own counsel

**Impact:** This email proves the entire state court system was complicit in concealing constitutional violations, transforming individual prosecutorial misconduct into systemic denial of due process.

# VII. WHY THE OPPOSITION'S DEFENSES COLLAPSE

## The McIntosh Email Destroys Every Defense:

**"Guilty Plea Bar" Argument:**

- **April 2022**: McIntosh email proves no crime existed - mother offering custody
- **Cannot have valid guilty plea** to crime that prosecution's own investigator documented didn't exist
- **Logical Absurdity**: "We prosecuted him for 'abducting' a child when the mother was willing to give custody, illegally detained him for 90 days based on fabricated threats about this non-existent crime, coerced a guilty plea, and

now that guilty plea prevents him from challenging our fabrication of a non-existent crime."

**"Prosecutorial Immunity" Smoke Screen:**

- **Doesn't protect fabrication of evidence** (*Buckley v. Fitzsimmons*)
- **14-month municipal notice** creates *Monell* liability regardless of individual immunity

**"Municipal Policy" Red Herring:**

- **14 MONTHS** of pre-arrest constitutional violation notices
- **Board's complete silence** = deliberate indifference
- **Single incident can establish policy** when inadequate response to known violation

### What Opposition Conspicuously Avoids:

1. **ZERO mention** of DAI Peña's 37 recorded admissions
2. **ZERO analysis** of the fabricated FBI "threat" evidence
3. **ZERO acknowledgment** of the 14-month pre-arrest municipal notice timeline
4. **ZERO explanation** for the systematic Brady violations

**WHY?** Because these facts are indefensible.

## VIII. THE SLAM DUNK: ILLEGAL DETENTION BASED ON KNOWN INNOCENCE

### The Irrefutable Core Violation:

**FACT 1:** Appellant was covered under PC 278.7 (legal necessity defense)

- DAI Peña admitted: "I believe I have good cause in doing what I did"
- Commissioner Ratekin trying to place Bryce in facility = textbook PC 278.7

**FACT 2:** DA knew this defense applied

- Peña: "If this goes to trial, you'll probably win"
- No charges filed for **over a year** despite "ongoing abduction"

**FACT 3:** FBI contact was Peña's own recommendation

- After year of cooperation, when Peña threatened prosecution, Appellant said he'd contact FBI
- **Peña himself said FBI contact "would likely pause things for things to be properly investigated"**
- FBI contact originated from DOJ referral - legitimate law enforcement consultation
- Peña later committed perjury in arrest warrant contradicting his own recommendation

**FACT 4:** 90-day detention was based on criminal deception of the court

- Cherry-picked fragments from constitutionally protected speech while suppressing explicit threat denials
- Concealed that FBI contact was Peña's own suggestion
- Suppressed year-long cooperative relationship evidence
- Used protected speech to create false narrative while refusing to file threat charges
- False custody promises to induce plea after illegal imprisonment

**CONSTITUTIONAL IMPACT:** When the state knowingly imprisons an innocent person by criminally misleading the court about constitutionally protected speech - including lying about their own investigator's recommendations - **no procedural defense can cure that fundamental violation.**

**Peña's Criminal Deception Demands Prosecution:** This isn't investigative technique - it's systematic criminal deception of the court. Peña's arrest warrant deliberately suppressed crucial context to mislead the court about the nature of constitutionally protected speech:

- A year of documented email exchanges showing cooperation
- His own recorded admissions (47 times) that case lacked merit

- His own recommendation to contact FBI
- The explicit threat denials made during the same conversations
- The established cooperative relationship

**The prosecution knew these were constitutionally protected statements - which is why they never filed threat charges - but criminally misled the court anyway to secure unprecedented detention for coercive purposes.**

## IX. THE ULTIMATE VINDICATION

**The day Bryce turned 18—the first moment he was legally free to choose—he ran home to his father.** This immediate return by a young man whose life was derailed by the state's actions provides the ultimate proof that:

1. **Appellant's original concerns were justified**
2. **The prosecution was a travesty**
3. **The child's clear preference was always to live with his father**
4. **No "abduction" ever occurred—just a father protecting his son**

## X. CONCLUSION: THE ILLEGAL DETENTION STANDS ALONE

**While this Appendix demonstrates the breadth and depth of constitutional violations in this case, the Ninth Circuit need not resolve every claim to provide complete relief.**

### THE SINGLE DECISIVE FACT:

**Appellant was illegally detained for 90 days based on evidence the prosecution knew was fabricated, when they knew he was protected under PC 278.7, for a crime that their own investigator documented didn't exist.**

### THIS VIOLATION ALONE REQUIRES REVERSAL BECAUSE:

1. **Clearly Established Law:** Detention based on fabricated evidence violates the Fourth Amendment (*Manuel v. City of Joliet*)
2. **Undisputed Facts:** McIntosh email proves no crime existed; Peña admissions prove they knew it

3. **Systematic Documentation:** 14 months of pre-arrest municipal notice with no response
4. **Physical Harm:** STEMI heart attacks directly caused by illegal detention
5. **Ultimate Vindication:** Bryce's immediate return home at 18 proves father was right all along

## THE OPPOSITION'S PROCEDURAL DEFENSES CANNOT OVERCOME:

- **90 days of illegal detention** for a fabricated crime
- **Systematic suppression** of exculpatory evidence
- **Municipal indifference** to 14 months of pre-arrest documented violations
- **Physical torture** through prolonged illegal imprisonment

This case is not about complex legal theories or disputed facts. It is about the fundamental principle that the government cannot imprison someone for 90 days based on evidence they know is fabricated.

That principle, standing alone, requires reversal of the District Court's dismissal and recognition that clearly established constitutional rights were violated.

**THE BOTTOM LINE:** When the state destroys a family for three years, illegally detains a father for 90 days, and fabricates evidence to do it - all while ignoring 14 months of formal legal notice - the Constitution demands accountability.

**These excerpts, unrebutted in Appellees' 1400 pages, prove systemic misconduct.** Excerpts from lodged records show Appellees' addendums confirm omissions (e.g., no rebuttal to Peña at Vol. 4, pp. 800-900), reinforcing their evasion of the core constitutional violation.

Dated: 09/16/25

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on 09/16/25.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Robert Emert

Robert Emert, Pro Se